**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**KMEDIA, INC.**
**d/b/a VIVOPHONE,**
**a Florida corporation,**

      **Plaintiff,**                            **CASE NO.:  07-20958-CIV-KING/GARBER**

**vs.**

**VONAGE AMERICA, INC.,**
**a Delaware corporation, and**
**VONAGE MARKETING, INC.,**
**a Delaware corporation,**

      **Defendants.**
_____/

**DEFENDANTS' MEMORANDUM OF LAW**
**SUBMITTED IN OPPOSITION TO REQUEST**
**FOR PRELIMINARY INJUNCTION**

      Defendants Vonage America, Inc. and Vonage Marketing, Inc. (collectively,

"Defendants" or "Vonage"), by and through their attorneys, Duane Morris LLP, file this

Memorandum of Law in Opposition to Request for Preliminary Injunction, and state as follows:

**PRELIMINARY STATEMENT**

      They say a picture is worth a thousand words.  That is certainly true in this case, where

just three graphics demonstrate that there is no basis for any of plaintiff's claims.  Plaintiff is

seeking to enjoin Vonage's use of a V mark that is shown in graphic number 3 below.  Plaintiff's

claims are based on plaintiff's use of a purported V mark shown in graphic number 2 below.

However, Vonage has prior rights in the V mark shown in graphic number 1 below, and the V

mark in graphic 3 is merely an updated version of that shown in graphic 1.  These three graphics

CASE NO.:  07-20958-CIV-KING/GARBER

compellingly demonstrate that: (1) Defendants have prior rights; (2) plaintiff's intent and not

Defendants' intent should be at issue; and (3) all of plaintiff's claims are baseless.

1.



(hereinafter referred to as the "Original Vonage Mark")
First used in 2001.

2.



(hereinafter referred to as the "Plaintiff's Purported Mark")
First used in 2004.

3.



(hereinafter referred to as the "Updated Vonage Mark")
First used in 2006.

In any event, plaintiff's request for a preliminary injunction in this case is absurd given

that Defendants began using and filed federal trademark applications to register the mark at issue

a year ago.  In addition, since then, Defendants have used the disputed mark prominently in all

kinds of advertising and on product packaging.  As a competitor, plaintiff obviously knew about

Vonage's use of the mark and cannot be permitted to wait a year and then seek extraordinary

relief.[1]

---

[1] Even now plaintiff continues to delay.  Plaintiff stated to the Court more than 3 weeks ago that
it does not seek a preliminary injunction "at this time."  See "Plaintiff's Request to Adjourn
and/or Modify the Evidentiary Hearing on a Preliminary Injunction Dated April 23, 2007."
Since plaintiff itself does not seek a preliminary injunction, no preliminary injunction should be
issued.

CASE NO.:  07-20958-CIV-KING/GARBER

## STATEMENT OF FACTS

While the pertinent facts are set forth in the accompanying Declarations of John S. Rego, sworn to on May 15, 2007 ("Rego Decl."), Alan Kalb, sworn to on May 16, 2007 ("Kalb Decl."), Timothy Carr, sworn to on May 15, 2007 ("Carr Decl.") and Christina S. Kim, sworn to on May 16, 2007 ("Kim Decl.").  Vonage provides herein a summary of the most salient facts for the Court's convenience.

In 2001, Vonage began using the Original Vonage Mark in connection with its telecommunication services and products in interstate commerce.  See Rego Decl. ¶ 5.  As detailed below, Vonage made extensive use of the Original Vonage Mark in connection with its telecommunication products and services.  See Rego Decl. ¶ 6.  In early 2006, Vonage updated the Original Vonage Mark and created the Updated Vonage Mark. See Rego Decl. ¶ 7.  In March 2006, Vonage began using the Updated Vonage Mark in connection with its telecommunications goods and services.  See Rego Decl. ¶ 8.  The Original Vonage Mark and the Updated Vonage Mark are hereinafter collectively referred to as the "Vonage Mark."

In 2004, long after Vonage acquired rights in its Vonage Mark, Plaintiff Kmedia, Inc. d/b/a VivoPhone ("Plaintiff" or "Kmedia") appears to have started its business and began using Plaintiff's Purported Mark.  See Complaint ¶ 10.  Notably, Plaintiff originally used the color blue in connection with the V portion of Plaintiff's Purported Mark.  (Kim Decl. ¶ 6) but in January 2006 switched the color of its V to the orange color used prominently by Defendants since 2001. See Kim Decl. ¶ 7.

## ARGUMENT

## I.    PRELIMINARY INJUNCTIVE RELIEF IS AN EXTRAORDINARY AND DRASTIC REMEDY

"To prevail on a motion for preliminary injunction, the plaintiff must establish that:

CASE NO.:  07-20958-CIV-KING/GARBER

(1) there is a substantial likelihood of success on the merits of the claims; (2) he will suffer irreparable harm in the absence of injunctive relief; (3) the threatened injury to the plaintiff outweighs any potential harm to the defendant as a result of the injunction; and (4) granting the injunction would not be adverse to the public interest."  See Michael Caruso & Co., Inc. v. Estefan Enters., Inc., 994 F. Supp. 1454, 1457-58 (S.D. Fla. 1998); see also Four Seasons Hotels v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003).  "Because a preliminary injunction is a 'drastic remedy,' the plaintiff bears the burden to 'clearly establish' each of the four elements."  Caruso, 994 F. Supp. at 1458; see also Café 207 v. St. Johns County, 989 F.2d 1136, 1137 (11th Cir. 1993); Anheuser-Busch, Inc. v. A-B Distribs., Inc., 910 F. Supp. 587, 589 (M.D. Fla. 1995).

Indeed, the Eleventh Circuit has warned that a preliminary injunction is "an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to each of the four prerequisites."  See Four Seasons Hotel, 320 F.3d at 1210 (emphasis added).  In Caruso, supra, this Court echoed that directive, calling a preliminary injunction "an extraordinary remedy, not available unless the plaintiff carries his burden of persuasion as to all of the four prerequisites."  994 F. Supp. at 1458.  "The primary justification for granting a preliminary injunction is to preserve the court's ability to render a meaningful decision after a trial on the merits."  Id.

## II.     PLAINTIFF DOES NOT HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

To prevail on its motion for a preliminary injunction, Plaintiff must establish that "there is a substantial likelihood of success on the merits of the claims."  See Caruso, 994 F. Supp. at 1457-58.  In order to demonstrate a likelihood of success on the merits of plaintiff's claims in this case, Plaintiff must prove that it had prior use of a valid trademark and that there is a

likelihood of confusion.  <u>Lonestar Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.</u>, 106 F.3d 355, 360 (11th Cir. 1997).  The issue of priority is a threshold question that must be resolved before the court even considers likelihood of confusion.  <u>Id.</u>  The same analysis with respect to priority and likelihood of confusion applies to all of Plaintiff's claims.  <u>See</u> <u>Vital Pharmaceuticals, Inc. v. American Body Building Products, LLC</u>, 2007 U.S. Dist. LEXIS 3659, *15 (S.D. Fla. January 12, 2007); <u>Fila U.S.A., Inc. v. Nam Joo Kim</u>, 884 F. Supp. 491, 495 (S.D. Fla. 1995).

### A.  <u>VONAGE HAS PRIOR RIGHTS</u>

If a mark is not inherently distinctive, then a business can only obtain rights in the mark when it attains a secondary meaning.  <u>Investacorp, Inc. v. Arabian Investment Banking Corp. (Investcorp) E.C.</u>, 931 F.2d 1519, 1522 (11th Cir. 1991).  As discussed in detail in Section B below, Plaintiff's Purported Mark is not inherently distinctive as applied to telecommunication products and services because it merely consists of a common letter V and generic design elements.  In addition, Plaintiff has failed to offer any evidence, and cannot demonstrate, that Plaintiff's Purported Mark has acquired secondary meaning.  On this basis alone, Plaintiff is prevented from claiming any enforceable rights in Plaintiff's Purported Mark.

While Plaintiff's Purported Mark is not entitled to protection, Plaintiff is also unable to prove prior use because Vonage and its affiliates began using an orange V and circular black-colored design within the V mark long before Plaintiff's purported date of first use.  <u>See</u> Kalb Decl. ¶ 9.  Plaintiff claims that it began using a V and design within the V since at least early 2004.  <u>See</u> Complaint ¶ 10.  However, the facts indisputably reveal that Vonage and its affiliates began using an orange V and circular black-colored design within the V in 2001, and therefore, Vonage has prior rights to an orange V and circular design within a V mark in connection with

its telecommunications products and services.

"[T]rademark rights are appropriated only through actual prior use in commerce." Tally-Ho, Inc. v. Coast Community College District, 889 F.2d 1018, 1022 (11th Cir. 1989).  Thus, "a party has established 'prior use' of a mark sufficient to establish ownership [upon] . . . '[s]howing, first, adoption, and, second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'"  Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1195 (11th Cir. 2001). "Courts generally must inquire into the activities surrounding the prior use of the mark to determine whether such an association or notice is present."  Id.

Vonage was the first to adopt and use an orange V and circular black-colored design within the V in connection with telecommunication goods and services.  In 2001, Vonage engaged the services of an outside agency to develop and create the Original Vonage Mark featuring the word VONAGE in the color orange and an orange V and circular black-colored design within the V.  See Rego Decl. ¶ 3.  Vonage began using the Original Vonage Mark in 2001 by selling and advertising its telecommunication services and products under the Original Vonage Mark in interstate commerce.  See Rego Decl. ¶ 5.  From 2001 to the end of 2005, Vonage spent over $311,000,000 dollars in advertising and promotional costs to promote its telecommunication services and products under the Original Vonage Mark on the Vonage's website, Vonage business cards, product packaging, letterhead and stationery, advertising, promotional materials and the like.  See Rego Decl. ¶ 6.

In early 2006, Vonage engaged the services of an outside agency to update the Original Vonage Mark and create the Updated Vonage Mark by modernizing the design within the V from a circular black colored design to a blue colored dot and modifying the font of the V, but

obviously maintaining the well known Vonage orange color.  See Rego Decl. ¶ 6.  In March

2006, Vonage began using the updated Updated Vonage Mark in connection with its goods and

services.  See Rego Decl. ¶ 7.

Vonage's changes to the font and the design within the V were simply modifications of

the Original Vonage Mark that did not alter the continuing commercial impression of the

Original Vonage Mark.  See Hess's of Allentown, Inc. v. National Bellas Hess, Inc., 169

U.S.P.Q. 673, 677 (T.T.A.B. 1971) (a mark can be modified or changed without loss of priority

if done in such a way that the continuing common element of the mark retains its impact and

symbolizes a continuing commercial impression); 3 J. Thomas McCarthy, *McCarthy on*

*Trademarks & Unfair Competition* § 17:26 (4th ed. 1998) ("Trademark rights inure in the basic

commercial impression created by a mark, not in any particular format or style.").  A minor

difference in the marks, such as a modernization of the later mark, would not be a basis for

breaking the chain of priority.  See In re Flex-O-Glass, Inc., 194 U.S.P.Q. 203, 205-06 (T.T.A.B.

1977); Humble Oil & Refining Co. v. Sekisui, 165 U.S.P.Q. 597, 603-04 (T.T.A.B. 1970) ("[A]

change which does not alter [a mark's] distinctive characteristics represents a continuity of

trademark rights.").[2]  The continuance of the common and essential features of Original Vonage

Mark, namely the orange V and the presence of a circular design within the "V", maintained the

commercial impression of the Original Vonage Mark.  Accordingly, customers encountering the

Updated Vonage Mark accept it as the same Original Vonage Mark or as simply a modification

or modernization thereof.

---

[2] Without "tacking," an owner's priority in his mark would be reduced by alterations to the mark, which would discourage altering the mark in response to changing consumer preferences, evolving aesthetic developments, or new advertising and marketing styles.  Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1048 (9th Cir. 1999).

CASE NO.:  07-20958-CIV-KING/GARBER

Not only was Vonage the first to adopt and use an orange V and circular design within the V mark, but the Vonage Mark has acquired secondary meaning though Vonage's widespread and successful $777 million advertising campaign and substantial sales, see Rego Decl. ¶¶ 8-19. Therefore, consumers readily associate the Vonage Mark with Vonage's goods and services.  See Investacorp, Inc., 931 F.2d at 1525 (using four factors to evaluate secondary meaning, namely (i) the length and manner of use; (ii) the nature and extent of advertising and promotion; (iii) the efforts made to promote a conscious connection in the public's mind between the mark and the business; and (iv) the extent to which the public actually identifies the name with the business' goods/services) (citing Conagra, Inc. v. Singleton, 743 F.2d 1508, 1513 (11th Cir. 1984)).

Since Vonage's first sale of its telecommunication services and products bearing the Vonage Mark in 2001, the Vonage Mark has experienced consumer recognition and growing commercial success due to Defendants' public relations, promotional, marketing and advertising activities in a variety of media channels, including television, radio, newspapers, magazines and the Internet.  See Rego Decl. ¶¶ 12-15.  To date, Vonage has over 2.4 million subscribers to its telecommunication services and products and has invested approximately $777,000,000 dollars in the advertisement and promotion of the Vonage Mark.  See Rego Decl. ¶¶ 9-19.

Vonage has and continues to extensively advertise and promote the Vonage Mark and the services and products sold thereunder through the national media, the Internet and through other forms of advertisements, including commercials featuring the Vonage Mark on various major television broadcast and cable networks, including CBS, NBC, CNN, USA, MTV and AMC. See Rego Decl. ¶ 11.  Vonage has also sponsored various print advertisements featuring the Vonage Mark and its services and products in leading national publications, including:  the Miami Herald, USA Today, the Wall Street Journal, the New York Times, Newsweek, US News

CASE NO.:  07-20958-CIV-KING/GARBER

& World Report and National Geographic.  See Rego Decl. ¶ 13.  Many national, local and trade

publications have published unsolicited articles featuring information about the Vonage.  See

Rego Decl. ¶ 17.  The fame of the Vonage Mark is also evidenced by the vast number of

references to Vonage on the Internet, e.g., www.wikipedia.org, www.getisp.info.  See Rego

Decl. ¶ 17.

Given that Vonage was the first to adopt, use and achieve secondary meaning in an

orange V and circular design within the V in connection with telecommunication goods and

services, Defendants have priority and Plaintiff cannot succeed on the merits and therefore, there

is absolutely no basis for a preliminary injunction.

**B.        THERE IS NO LIKELIHOOD OF CONFUSION**

As detailed above, in this case, Vonage extensively used the Original Vonage Mark long

prior to Plaintiff's adoption of their purported V mark.  Accordingly, since Vonage has prior

rights, the Court need not analyze likelihood of confusion and no relief should be granted for

Plaintiff.

Moreover, Plaintiff simply cannot demonstrate a likelihood of confusion in this case.  To

show likelihood of confusion the Plaintiff "must present compelling evidence that there is a

likelihood that consumers will be confused about the relationship or affiliation" between

Plaintiff's services and Defendants' services.  Caruso, 994 F. Supp. at 1458.  Likelihood of

confusion "means probable confusion rather than mere possible confusion."  Id. (citing Shatel

Corp. v. Mao Ta Lumber & Yacht Corp., 697 F.2d 1352, 1356 n. 2 (11th Cir. 1983)).  In this

case, the Plaintiff has not and cannot meet this rigorous standard.

In this Circuit, a seven factor test is used to determine whether there is a likelihood of

confusion.   These factors are:  (i) the type/strength of the plaintiff's mark; (ii) the similarity of

CASE NO.:  07-20958-CIV-KING/GARBER

the marks at issue; (iii) the similarity of the services at issue; (iv) the similarities of the retail outlets and purchasers; (v) the similarity of advertising campaigns; (vi) the defendant's intent; and (vii) actual confusion.  See Freedom Sav. & Loan Ass'n. v. Way, 757 F.2d 1176, 1182 (11th Cir. 1987).

The type/strength of the mark and actual confusion have been identified as the two most important factors in the analysis.  See Dieter v. B&H Ind. of Southwest Florida, Inc., 880 F.2d 322, 326 (11th Cir. 1989).

In this case, the facts and the most important factors in the confusion analysis weigh strongly in Vonage's favor and against any finding of likelihood of confusion.

<u>Plaintiff's Purported Mark is Weak and Entitled to a Very Narrow Scope of Protection, if Any</u>

Plaintiff's Purported Mark is a non-distinctive presentation of the common letter V with a generic dot in the middle of the V and a depiction of a generic telephone handset design appearing at an angle above the V.  On its face, Plaintiff's Purported Mark V with a generic dot design and a generic phone design is not distinctive as applied to telecommunication services. As detailed below, the common letter V is widely used as part of marks for telecommunication related services, and obviously a generic description of a telephone is merely descriptive of Plaintiff's telecommunication services.

Tellingly, Plaintiff has not obtained or even applied for registration of its Purported Mark.  If Plaintiff's Purported Mark was actually a distinctive and valuable source-identifying equity of Plaintiff then Plaintiff surely would have sought trademark registration of the mark at some point, but it hasn't.  Plaintiff's failure to do so is indicative of the lack of strength of Plaintiff's Purported Mark.  See Omicron Capital, LLC v. Omicron Capital, LLC, 433 F. Supp.2d 382, 390 (S.D.N.Y. 2006) (finding plaintiff's failure to register mark as evidence of

CASE NO.:  07-20958-CIV-KING/GARBER

weakness of mark).

Not only has Plaintiff not sought or obtained registration of its Purported Mark, but Plaintiff's Complaint offers absolutely no evidence to demonstrate that the mark has developed any level of strength or consumer recognition.  Plaintiff does not provide any sales figures or any advertising or promotional figures and Plaintiff does not offer any consumer recognition surveys.  In fact, Plaintiff provides only one example of its alleged use of its Purported Mark – a single screen shot from Plaintiff's web site from the year 2004, see Complaint ¶ 10, showing the Purported Mark in immediate association with the VIVOPHONE name.

Plaintiff provides no other evidence of any advertising or promotional use of the Purported Mark – no print ads, no fliers, no sales brochures, no television ads, no newspaper inserts, no displays, no collateral promotional items, and no Internet promotion beyond a single screen shot of alleged use of the Purported Mark on Plaintiff's own web site several years ago.  Plaintiff provides no evidence of use of the mark on any products.  Plaintiff's utter lack of evidence of actual usage and promotion of its Purported Mark is telling.  Plaintiff simply cannot show that it has used and promoted its Purported Mark to an extent that the mark has any appreciable level of consumer recognition or secondary meaning.  Accordingly, Plaintiff's Purported Mark is extremely weak and simply does not function as an identifier of source.  See Nailtiques Cosmetic Corp. v. Salon Sciences, Corp., 1997 U.S. Dist. LEXIS 4662, *6 (S.D. Fla. January 9, 1997); Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc., 2007 U.S. App. LEXIS 7444, *12 (4th Cir. 2007) (finding that lack of market share and advertising expenditures contributed to weakness of plaintiff's mark).

Even if Plaintiff could show that it actually has used and promoted its Purported Mark at a level sufficient to establish any consumer recognition, the mark is still extremely weak because

there are numerous third parties in the communications industry that have used and registered marks consisting of or incorporating V designs, and V designs with designs in the middle of the V.  Attached as Exhibit 1 to the Kalb Decl. is the trademark search report that Vonage conducted in 2006 before it adopted the Updated Vonage Mark.  The search report shows numerous registrations and applications for V marks, and V marks containing a design element in the middle of the V or in association with the V for products and services in the communications industry.  In addition, Exhibit 1 to the Kim Decl. contains print-outs of web site pages showing marketplace use of V marks by a host of third parties in the communications field and Exhibit 2 to the Kim Decl. shows additional applications and registrations for V marks incorporating design elements in the middle of or in association with the V and that are currently subsisting in the U.S. Patent & Trademark Office.

Such rampant third party registration and use of "V" marks in the communications field vastly weakens whatever strength Plaintiff's Purported Mark may have otherwise possessed.  Extensive third party use and registration of similar marks serves to weaken the scope of protection of a plaintiff's mark and undermines a finding of likelihood of confusion.  <u>Caruso</u>, 994 F. Supp. at 1459 (finding that defendant's evidence of third-party use of the term "bongo" renders it unlikely that the mark will have strong trademark significance); <u>Tancogne v. Tomjai Enterprises Corp.</u>, 408 F. Supp.2d 1237, 1246 (S.D. Fla. 2005); <u>HBP Inc. v. American Marine Holdings Inc.</u>, 290 F. Supp.2d 1320, 1329 (M.D. Fla.  2003); Restatement of Torts § 729, Comment (g), at 596 (1938) ("The greater the number of identical or more or less similar trade-marks . . . the less is the likelihood of confusion."); <u>Carnival Corp. v. SeaEscape Casino Cruises Inc.</u>, 74 F. Supp. 2d 1261, 1266 (S.D. Fla. 1999) (third-party registrations for marks including "fun" weakens the FUN SHIP mark and cuts against a finding of likelihood of confusion); <u>La</u>

CASE NO.:  07-20958-CIV-KING/GARBER

Dove, Inc. v. Playtex Jhirmack, Inc., 1991 U.S. Dist. LEXIS 11337, *11 (S.D. Fla. March 4, 1991) (third party use of the words "fast" and/or "freeze" weakens plaintiff's FAST FREEZE mark and undermines a finding of likelihood of confusion); Bell Laboratories, Inc. v. Colonial Products, Inc., 644 F. Supp. 542, 546 (S.D. Fla. 1986) (third party use of "FINAL" showed that FINAL was weak and addition of "FLIP" to defendant's mark negated any confusion between FINAL and FINAL FLIP for identical products).

The existence of third party registrations alone is evidence of third party use.  See Ocean Bio-Chem, Inc. v. Turner Network Television, Inc., 741 F. Supp. 1546, 1556 (S.D. Fla. 1990). Third party registrations of similar marks are "entitled to considerable weight" in determining the weakness of a plaintiff's mark and no likelihood of confusion.  Id.

It is clear that consumers are accustomed to seeing and distinguishing a myriad of "V" and design marks in the communications field and are able to readily distinguish between those marks based upon differences between the marks, such as additional/different design elements, colors and house marks.  In this case, the inclusion of a phone design in Plaintiff's Purported Mark, and association of Plaintiff's Purported Mark with the VIVOPHONE house mark, independently serve to distinguish Plaintiff's Purported Mark from Vonage's V mark and thus render confusion unlikely.  See, e.g., Security Works!, Inc. v. Security World International Inc., 1994 U.S. Dist. LEXIS 19938, **18-19 (S.D. Fla. November 14, 1994) (noting that when a weak mark is involved "any variation in the parties marks tends to distinguish [the marks] and dispel confusion").

Given the non-distinctive character of Plaintiff's Purported Mark, the lack of evidence of sales, advertising and promotion, and the rampant third party registration and use of similar "V" marks with designs in the telecommunications field, Plaintiff's Purported Mark is extremely

CASE NO.:  07-20958-CIV-KING/GARBER

weak and entitled to a very narrow scope of protection, if any.  The important factor of the strength of the plaintiff's mark thus weighs heavily in Vonage's favor.

The Marks are Not Similar

Plaintiff's Complaint misleadingly claims that Vonage is "using" Plaintiff's Purported Mark.  In fact, the V mark that Vonage using is distinct from Plaintiff's Purported Mark.  Indeed, any similarities between the marks are in elements in which Vonage clearly has established prior rights – a stylized V, a circular design within the V, and use of the color orange.  The differences between Plaintiff's Purported Mark and the Updated Vonage Mark include the following:

First, the typestyle of the Updated Vonage Mark is different from that of Plaintiff's Purported Mark and the V in the Updated Vonage Mark is wider than the V appearing in Plaintiff's Purported Mark.

Second, the dot designs that are contained within the respective V's are markedly different.  The Vonage dot design is significantly larger than the dot design in Plaintiff's Purported Mark, the Vonage dot design appears higher in the middle of the V than does the dot design in Plaintiff's Purported Mark, and the Vonage dot design appears primarily in a blue color, while the dot design in Plaintiff's Purported Mark is black.

Third, Plaintiff's Purported Mark features the additional design element of a depiction of a black telephone above at an angle above the V.  The telephone is depicted in a very prominent manner, at an odd angle, and clearly functions as a dominant feature of Plaintiff's Purported Mark.  Consumers, when viewing Plaintiff's Purported Mark, will undoubtedly notice the phone design as readily, if not more readily, than the common letter V.  The phone design is of particular dominance in the commercial impression of Plaintiff's Purported Mark given that consumers, faced with many V designs in the telecommunications marketplace, will be looking

CASE NO.:  07-20958-CIV-KING/GARBER

for other features to distinguish among the various marks.  The phone design incorporated at an odd angle in Plaintiff's Purported Mark is just such a distinguishing element.  Ocean Bio-Chem, Inc., 741 F. Supp. at 1556-57 (finding that defendant's design logo distinguished defendant's mark from plaintiff's).

Fourth, Plaintiff's Purported Mark as shown in the Complaint is locked up with the VIVOPHONE name which appears in equally prominent typeface.  The use of the VIVOPHONE house mark in proximity to Plaintiff's Purported Mark further distinguishes Plaintiff's Purported Mark from the Updated Vonage Mark and, in and of itself, renders confusion unlikely.  See La Dove, Inc., 1991 U.S. Dist. LEXIS at *12 (finding that defendant's prominent use of its JHIRMACK house mark on its hair care product undermined a finding of likelihood of confusion); see also Playtex Products, Inc. v. Georgia-Pacific Corp., 390 F.3d 158, 164-65 (2d Cir. 2004).  Presence of house mark NORTHERN prevents likely confusion); W.W.W. Pharm. Co., Inc. v. The Gillette Co., 984 F.2d 567, 573 (2d Cir. 1993) (RIGHT GUARD SPORT STICK not confusingly similar to SPORTSTICK as matter of law; "when a similar mark is used in conjunction with a company name, the likelihood of confusion may be lessened").

Print-outs of pages from Plaintiff's web site, www.vivophone.com, are attached as Exhibit 3 to the Kim Decl.  These print-outs show consistent and prominent use of the VIVOPHONE house mark in close proximity to Plaintiff's Purported Mark.  It is thus readily apparent that when consumers see Plaintiff's Purported Mark they will immediately know that Plaintiff is its source because of the prominent presence of Plaintiff's VIVOPHONE house mark.

When taken together, the above differences between the marks at issue serve to create very distinct overall commercial impressions for the marks, which in and of itself compels the conclusion that confusion is not at all likely.  See, e.g., HBP, Inc., 290 F. Supp.2d at 1332-33

CASE NO.:  07-20958-CIV-KING/GARBER

("[e]ven as to goods that are directly competitive, where the appearance and usage of the common elements are dissimilar, confusion is unlikely").  Indeed, the commercial impression created by Plaintiff's Purported Mark is that of merely a descriptive representation of the word mark VIVOPHONE, with the "V' standing for "VIV," the dot standing for "O," and the depiction of a phone standing for "PHONE."  The use of the VIVOPHONE house mark in close association with Plaintiff's Purported Mark serves to reinforce this commercial impression, which is vastly different than the commercial impression of the Updated Vonage Mark.

The Advertising Media is Not Similar

Plaintiff's complaint is devoid of any evidence of advertising or promotion done by Plaintiff in connection with Plaintiff's Purported Mark, other than a page from Plaintiff's own web site  in 2004.  Vonage advertises its products and services with a very distinctive advertising campaign.  One of the most widely used elements of the campaign are television commercials that prominently feature the distinctive and memorable song "Woo Hoo" performed by the band called the 5.6.7.8's., as well as television commercials that feature testimonials from consumers regarding their positive experiences with the Vonage phone service, which commercials also feature the "Woo Hoo" song as background music.  See Rego Decl. ¶ 12.  These testimonial commercials also use the "Woo Hoo" song as background music.  See Rego Decl. ¶ 12.  Vonage's advertising is unique and distinctive and serves to readily distinguish Vonage's services and products from those of any third party, including Plaintiff.  Accordingly this factor weighs in Vonage's favor.

Vonage Adopted it its V in Good Faith

The good faith of Vonage in this matter is conclusively evidenced by the fact that for several years prior to Plaintiff's adoption of its purported mark Vonage had been using the

CASE NO.:  07-20958-CIV-KING/GARBER

Original Vonage Mark, which included an orange V with a black circular design with the V mark.  Given Vonage's long-standing heritage of using an orange V with a design within the V mark, it is obvious that Vonage was not copying Plaintiff's Purported Mark or attempting to trade on any good will of Plaintiff when Vonage developed the Updated Vonage Mark.

Indeed, Vonage's update of its V and design with the V mark was created independently by an outside creative agency hired by Vonage.  See Rego Decl. ¶ 7.  The agency designed the mark after the Original Vonage Mark, merely providing a more updated look to the mark.  See Carr Decl. ¶ 3.  The agency created the mark without knowledge of Plaintiff or Plaintiff's Purported Mark.  See Carr Decl. ¶ 5.

Vonage's good faith is further demonstrated by the fact that its in house counsel conducted a full trademark design search when adopting the Updated Vonage Mark.  See Kalb Decl. ¶ 3.  The search report of over 454 pages in length did not disclose Plaintiff's Purported Mark.  See Kalb Decl. ¶ 3.  Evidence of good faith exists where one "has requested a trademark search or has relied on the advice of counsel."  W.W.W. Pharmaceutical Co., Inc., 984 F.2d at 575.  Here, Vonage has done a search and relied on the advice of counsel.

Given the prior use by Vonage of an orange V and circular design within the V mark, the fact that an updated version of the mark was created independently by Vonage's agency, and the fact that Vonage's counsel conducted a full trademark search when adopting the new variation, it is abundantly clear that Vonage has acted in good faith and without any intent to copy Plaintiff's Purported Mark or trade on any goodwill of Plaintiff.  Accordingly this factor weighs strongly in Vonage's favor.

Furthermore, it is suspicious that Plaintiff adopted an orange V mark with a black circular design within the V several years after Vonage had begun using such a mark.  Plaintiff's

selection of the color orange is particularly suspect given that since its inception in 2001 Vonage has widely used the color orange as a key element in its promotional and advertising campaigns and its overall corporate identity.  See Rego Decl. ¶ 4.  Moreover the original design element within Vonage's V mark was circular in nature and black in color.  See Rego Decl. ¶ 3.

Given the scope of Vonage's advertising and promotional activity and Vonage's market leadership position there can be no doubt that Plaintiff was aware of Vonage's prior use of the color orange as well as a black, circular shaped design within a V when Plaintiff adopted its Purported Mark.  As such, not only has Vonage acted in good faith, but it seems Plaintiff was trying to trade on Vonage's good will in the Original Vonage Mark, including the orange color scheme, circular shaped design within the V, and black coloring for the design with the V, when Plaintiff adopted its Purported Mark.  Even more telling is the fact that the V in Plaintiff's Purported Mark originally appeared in the color blue.  See Kim Decl. ¶ 6.  Only in January 2006, long after Vonage had developed a strong good will and association of the color orange with its marks, products and services did Plaintiff switch the color of its V to orange.  See Kim Decl. ¶ 7.  The switch of the color of Plaintiff's V from blue to orange, made long after Vonage developed a reputation for use of orange, including in the Original Vonage Mark, is suspicious and further calls into question Plaintiff's good faith.

Indeed, as a matter of market reality and common sense, it is much more likely that Plaintiff would imitate and attempt to trade on the equity of the market leader than it would be the other way around.  See Fisons Horticulture, Inc. v. Vigoro Industries, Inc., 30 F.3d 466, 474 (3d Cir. 1994) ("Ordinarily, one expects that the new or junior user of the mark will use to its advantage the reputation and good will of the senior user by adopting a similar or identical mark.").

CASE NO.:  07-20958-CIV-KING/GARBER

<u>There is No Evidence of Actual Confusion</u>

While Plaintiff claims in its Complaint that confusion is occurring, <u>see</u> Complaint ¶ 20, Plaintiff tellingly did not provide any evidence of actual confusion in the Complaint.  Vonage has received no letters, e-mails or phone calls regarding Plaintiff or Plaintiff's Purported Mark. <u>See</u> Kalb Decl. ¶¶ 6-7.  Actual confusion is the "best" evidence of likelihood of confusion.  <u>See</u> <u>E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l. Imports</u>, 756 F.2d 1525, 1529-30 (11th Cir. 1985).  Moreover, the fact that the marks at issue have coexisted in the market for a long period of time –one year – without evidence of actual confusion strongly suggests that confusion is in fact not likely.  <u>See</u>, <u>e.g.</u>, <u>Oreck Corp. v. U.S. Floor Systems, Inc.</u>, 803 F.2d 166, 173 (5th Cir. 1986), <u>cert</u>. <u>denied</u>, 481 U.S. 1069 (1987) (concurrent use of marks without actual confusion was "highly significant").  As the Second Circuit has observed:

> If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion.

<u>Nabisco, Inc. v. PF Brands, Inc.</u>, 191 F.3d 208, 228 (2d Cir. 1999).  Accordingly, this important factor weighs heavily in Vonage's favor.

Given that the most important factors in the likelihood of confusion analysis weigh very heavily in Vonage's favor, it is clear that there is in fact no likelihood of confusion, that Plaintiff is not likely to succeed on the merits, and therefore that there is absolutely no basis for the drastic remedy of a preliminary injunction.

CASE NO.:  07-20958-CIV-KING/GARBER

IV.     **PLAINTIFF'S GROSS DELAY PRECLUDES IT FROM OBTAINING PRELIMINARY INJUNCTIVE RELIEF**

To prevail on its motion for a preliminary injunction, Plaintiff must also establish that it "will suffer irreparable harm in the absence of injunctive relief."  See Caruso, 994 F. Supp. at 1457-58.  However, despite Vonage's widespread public use of the Updated Vonage Mark for a year, Plaintiff sat on its hands and delayed in filing suit and seeking emergency relief in the form of this "extraordinary remedy."  See id. at 1458.

Various courts in the Eleventh Circuit have held that where a plaintiff delays in seeking preliminary injunctive relief, such delay weighs firmly against a finding of "irreparable harm." See e.g., Brown v. U.S. Dep't of Agriculture, 2006 U.S. Dist. LEXIS 65773, **5-6 (M.D. Fla. Sept. 13, 2006) (denying preliminary injunctive relief where plaintiffs delayed by over 3 months in filing suit, as "[s]uch a delay undermines Plaintiffs' argument that irreparable injury is imminent to an extent requiring drastic injunctive relief."); Hi-Tech Pharm., Inc. v. Herbal Health Prods., Inc., 311 F.Supp.2d 1353, 1357-58 (N.D. Ga. 2004) (denying injunctive relief for trademark infringement because plaintiff's 3-month "delay in seeking a preliminary injunction weighs against a finding of irreparable harm.").

In particular, "a plaintiff's delay in seeking an injunction in a trademark case 'tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.'" Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc., 188 F. Supp.2d 1350, 1355-56 (S.D. Fla. 2002).  In Seiko, the court found that plaintiff's delay vitiated the notion of irreparable harm and undercut any sense of urgency, and denied preliminary injunctive relief for trademark infringement where plaintiff waited "almost a full year."  Id. at 1356.

CASE NO.:  07-20958-CIV-KING/GARBER

Additionally, in Atlanta Sundries, Inc. v. S.C. Johnson & Son, Inc., 1994 U.S. Dist.

LEXIS 17943, *4 (N.D. Ga. Jan. 24, 1994), which involved an action for trademark

infringement, the court held that "plaintiff's own delay of almost a year in commencing this

lawsuit has convinced this court that plaintiff is unlikely to suffer irreparable harm [as] [p]laintiff

waited ten months to challenge defendants' trade dress".  See also Badillo v. Playboy Ent. Group,

Inc., 2004 U.S. Dist. LEXIS 8236, **5-8 (M.D. Fla. April 16, 2004) (holding that "a nine month

delay is fatal in this case to Plaintiffs' claims of irreparable harm."); accord Golden Bear Int'l,

Inc. v. Bear U.S.A., Inc., 969 F. Supp. 742, 748 (N.D. Ga. 1996) (denying injunctive relief where

plaintiff delayed for eight months in prosecuting trademark infringement claim and stating that

"undue delay speaks volumes about whether a plaintiff is being irreparably injured.") (internal

citations omitted).  Here, Plaintiff's delay of a year in seeking relief demonstrates that there is no

irreparable harm and precludes the granting of a preliminary injunction.

Furthermore, Vonage notes that "undue delay in seeking a preliminary injunction once

plaintiff has, or should have, knowledge of the infringement will probably result in its denial."

See, e.g., J. Gilson, *Trademark Protection and Practice* § 8.07[1] (1984) (emphasis added).  As

detailed above, Vonage has expended large amounts of money and effort putting the Updated

Vonage Mark widely and firmly in the national public's eye.  For Plaintiff, a competitor of

Vonage, to claim that it did not know about this alleged infringement, is not credible.  At the

absolute minimum, given the widespread use of the Updated Vonage Mark in a variety of

advertising media, Plaintiff should have known about Vonage's use of the mark that is the

subject of this litigation.  See, e.g., Citibank, N.A. v. Citytrust and Citytrust Bancorp, Inc., 756

F.2d 273, 276-77 (2d Cir. 1985) (preliminary injunction denied despite plaintiff's claim it was

unaware of competitor bank opening because court found "[i]t strains one's credulity" that

competitor bank was open for ten weeks in plaintiff's territory and plaintiff could not have

known); Nike, Inc. v. "Just Did It" Enters., 6 F.3d 1225, 1226 (7th Cir. 1993) (noting that where

"Nike spent more than three hundred million dollars advertising the trademarks, [they are] now

known to nearly every athlete and sports fan in the world."); accord A-1 Mortgage Corp. v. Day

One Mortgage, LLC, 2007 U.S. Dist. LEXIS 81, *18 (W.D. Pa. Jan. 3, 2007) (acknowledging

that because "A-1 has spent in excess of 4 million dollars on its advertising campaign . . . its

trade names have become well known within the mortgage brokerage and financial services trade

and the consuming public.").

Accordingly, Plaintiff's gross delay in filing this lawsuit when it knew or should have

known about the Updated Vonage Mark for a year undermines any argument that Plaintiff faces

imminent irreparable injury requiring drastic injunctive relief.

## V.  THE BALANCE OF HARDSHIPS OVERWHELMINGLY FAVORS VONAGE

Finally, Plaintiff must also establish that "the threatened injury to the plaintiff outweighs

any potential harm to the defendant as a result of the injunction". See Caruso, 994 F. Supp. at

1457-58.  If this Court were to issue a preliminary injunction, Vonage would immediately suffer

tremendous harm.  Indeed, Vonage has spent approximately $777 million in advertising expenses

since 2001, as part of a costly and expansive overall marketing effort to put the Vonage Mark

(and the "Vonage" brand image) widely and firmly in the national public's eye.  See  Rego Decl.

¶ 9-19.  Enjoining Vonage's use of the Updated Vonage Mark would not merely frustrate the

company's national advertising campaign, it would bring the effort to a screeching halt, costing

Vonage untold millions of dollars in lost revenue and profits.  See Kalb Decl. ¶ 11.

Additionally, Vonage's internal workings would be disrupted, as employees nation-wide

would be forced to scramble to remove use of the mark in the many media being utilized by the

company.  See Kalb Decl. ¶ 12.  The result would be that Vonage's relationships with current and prospective customers, including third-party vendors and other entities with a commercial interest in Vonage products, would suffer irreparable harm as a result of this extraordinary (and unnecessary) remedy.  See Kalb Decl. ¶ 12.

Vonage would be forced to remove the Updated Vonage Mark from all of its product packaging and have new products designed and manufactured, new product packaging designed and printed, all at enormous cost.  See Kalb Decl. ¶ 11.  Vonage would also have to remove the Updated Vonage Mark from and redesign its telephones and other devices and equipment, including company service vans, that display the Update Vonage Mark, as well as Vonage company signs, letterhead, business cards, and other promotional materials.  See Kalb Decl. ¶ 13. The time to design and create new equipment and packaging would also prevent Vonage from getting new customers, which is necessary in the telecommunications industry in order to counterbalance the churn rate.  See Kalb Decl. ¶ 11.

By contrast, the threatened injury to Plaintiff appears to be minimal at best.  Given the fact that Plaintiff has not provided any evidence of advertising or promotional use of the Purported Mark, Plaintiff would not suffer any appreciable harm.  The astronomical expense and burden that Vonage faces if its advertising efforts and product packaging are suddenly halted by court order far outweigh any potential minor inconvenience Plaintiff may claim to suffer.  In another trademark infringement case decided in this Circuit, Golden Bear Int'l., 969 F. Supp. at 748, the court held that "requiring Defendant to change its logo at this time could significantly impact Defendant's business.  Such a change would result in the loss of goodwill and possibly cause the failure of Defendant's business.  Thus, the potential harm to Defendant outweighs the risk of injury to Plaintiff pending the trial on the merits."  Unlike this Court's decision in

CASE NO.:  07-20958-CIV-KING/GARBER

Davidoff Extension, S.A. v. Davidoff Int'l, Inc., 612 F. Supp. 4, 7 (S.D. Fla. 1984) where preliminary injunctive relief was appropriate due to the fact that "[t]he plaintiff's background advertising and volume . . . vastly outweigh[ed] any investment defendants have" and defendant's "advertising altogether represented an investment of $2,000," the positions of the parties are reversed in this case. Here, Vonage's advertising expenses and volume vastly outweigh any investment Plaintiff has, and accordingly, this Court should find that the threatened injury to Vonage as a result of an injunction outweighs any potential harm to Plaintiff.

VI.   **ISSUANCE OF A PRELIMINARY INJUNCTION**
      **WOULD BE ADVERSE TO THE PUBLIC INTEREST**

As the market leader in voice over IP telecommunication services, Vonage provides telephone service to over 2 million customers.  These customers rely on Vonage to provide them with high quality, fairly priced and uninterrupted service.  Issuance of an injunction against the Updated Vonage Mark could jeopardize Vonage's relationship with such customers by virtue of the major impact that such an injunction would have on Vonage's business operations.  See Kalb Decl. ¶ 12. Potential disruption of the business of a company that provides telephone service to over 2 million people is plainly adverse to the public interest.  See La Dove, Inc., 1991 U.S. Dist. LEXIS at *14 (finding that "an injunction would disserve the public interest by removing from sales a highly successful and desirable product.").

**CONCLUSION**

For all of the reasons stated herein and in the accompanying Declarations of John S. Rego, Alan Kalb, Timothy Carr and Christina S. Kim,  Defendants respectfully request that this Court enter an order denying Plaintiff's request for preliminary injunctive relief, and granting Defendants' costs incurred herein and such other and further relief as may be proper.

CASE NO.:  07-20958-CIV-KING/GARBER

Dated:  May 16, 2007

Respectfully submitted,

**DUANE MORRIS LLP**

By: \_\_\_/s/ Lida Rodriguez-Taseff\_\_\_\_\_
**Lida Rodriguez-Taseff, Esq.**
lrtaseff@duanemorris.com
200 South Biscayne Blvd.
Suite 3400
Miami, FL 33131
Telephone: 305-960-2242
Facsimile : 305-960-2201

**Gregory P. Gulia, Esq.** (*Pro Hac Vice*)
**Eric W. McCormick, Esq.** (*Pro Hac Vice*)
**Christina S. Kim, Esq.** (*Pro Hac Vice*)
DUANE MORRIS LLP
gpgulia@duanemorris.com
ewmccormick@duanemorris.com
cskim@duanemorris.com
1540 Broadway
New York, NY 10036-4086
Telephone: 212-692-1000
Facsimile : 212-692-1020

*Counsel for Defendants, VONAGE AMERICA, INC.*
*and VONAGE MARKETING, INC.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 15, 2007, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document

is being served this day on all counsel of record identified on the Service List below in the

manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF

or in some other authorized manner for those counsel or parties who are not authorized to receive

electronically Notices of Electronic Filing.

By: \_\_\_/s/ Lida Rodriguez-Taseff\_\_\_\_\_
Lida Rodriguez-Taseff

CASE NO.:  07-20958-CIV-KING/GARBER

**<u>SERVICE LIST</u>**

**KMedia, Inc. d/b/a Vivophone v. Vonage America, Inc., and Vonage Marketing, Inc.**
**Case No.:  07-20958-CIV-KING/GARBER**

**J. Michael Wermuth, Esq.**
Atty. Email: michaelw@wermuthlaw.com
**WERMUTH LAW, P.A.**
8750 N.W. 36th Street
Suite 220
Miami, FL 33178-2499
Telephone: 305-715-7157
Facsimile: 305-715-8982

**Mark A. Cantor, Esq.** (*Pro Hac Vice*)
**Marc Lorelli, Esq.** (*Pro Hac Vice*)
**Brian S. Tobin, Esq.** (*Pro Hac Vice*)
Atty. Email: mcantor@brookskushman.com,
mlorelli@brookskushman.com,
btobin@brookskushman.com
**BROOKS KUSHMAN P.C.**
1000 Town Center, 22nd Floor
Southfield, MI 48075
Telephone: 248-358-4400
Facsimile: 248-358-3351

*Counsel for Plaintiff, KMEDIA, INC. d/b/a*
*VIVOPHONE.*
**via CM/ECF Electronic Notice of Filing**